# CHARLESTON.

CORA B. LINDAMOOD, *Admrx.*, v. POTOMAC LIGHT & POWER COMPANY.

Submitted October 28, 1919.   Decided November 4, 1919.

1. NEW TRIAL—*Newly Discovered Cumulative Evidence.*

   Evidence adduced by affidavits, on a motion for a new trial, in an action against a corporation, for damages for wrongful death alleged to have been occasioned by its negligent use of electricity, as having been first discovered after a trial resulting in a verdict for the defendant, and tending to prove the breaking of one of its high voltage wires, as to which no evidence had been adduced on the trial, and resultant contact of such wire with its service wires, at such a place and in such manner as would have caused the high voltage of the

broken wire to enter the building in which the decedent came to his death by means of an electric shock, at or about the time of his death, is not cumulative.  (p. 89).

2.    ELECTRICITY—  *ew Trial—Evidence Sufficient to Produce Different Result.*

Under the operation of the rule, *res ipsa loquitur,* the introduction of such evidence would make the defendant company in such case liable, if the break in the wire was the proximate cause of the injury, in the absence of proof by it of proper construction of the wires at the place of the break and due inspection of its lines, wherefore it is of such character as ought to produce a different result upon a new trial, if its effect should not be avoided in some way.  (p. 91).

3.    NEW TRIAL—*Diligence Required in Search for Newly Discovered Evidence.*

The duty to exercise reasonable diligence in his search for evidence, before trial, imposed upon a litigant by the law, does not require him to interview witnesses not known by him to possess any knowledge at all respecting his case, nor to have been so situated at any time as to render it likely or probable that they obtained such knowledge.  To make it incumbent upon him to interview a person for evidence, he must have some reason to believe or suspect that the person has some knowledge of the transaction, situation or facts involved in the litigation.  (p. 91).

4.    SAME—*Newly Discovered Evidence of Omission by Witness of Material Fact.*

Though ordinarily a new trial cannot be had upon the affidavit of a witness showing omission from his testimony of a material fact, by reason of his failure to recollect it while testifying, however important it may be, such an affidavit may be read in aid of those of other witnesses to the same fact, whose knowledge thereof was not discoverable by the exercise of reasonable diligence before the trial, when the omitted subject is new and the matter set forth in the affidavit will be decisive, if found to be true and its force and effect are not avoided in some way.  (p. 92).

5.    APPEAL AND ERROR—*Finding as to Newly Discovered Evidence Not Disturbed.*

The finding of a trial court on an issue of fact, as to whether matter relied upon in support of a motion for a new trial, is new and after-discovered, will not be disturbed by the appellate court, when the evidence of lack of prior knowledge

thereof is clear and positive and the opposing evidence uncertain, indefinite and inconclusive.  (p. 93).

6.  NEW TRIAL—*Necessity of Wide and Minute Investigation Before Trial.*

Though the injured party is under a duty, before suing for redress, to make a reasonably diligent effort to ascertain by what wrongful act the injury was inflicted, he is not required at all hazards to discover obscure matters or such as cannot be found otherwise than by a wide, thorough and minute investigation, and he may rely upon them in a motion for a new trial, if discovered before entry of judgment.  (p. 94).

(LYNCH, JUDGE, absent.)

Error to Circuit Court, Berkeley County.

Action for wrongful death by Cora B. Lindamood against the Potomac Light & Power Company.  Verdict for defendant set aside on the ground of newly discovered evidence, and it brings error.

*Affirmed.*

*Martin & Seibert,* for plaintiff in error.
*H. H. Emmert* and *J. O. Henson,* for defendant in error.

POFFENBARGER, JUDGE:

This writ challenges the correctness of an order setting aside a verdict for the defendant in an action predicated on allegations of wrongful death, on the ground of newly discovered evidence.

A statement in detail of the evidence adduced upon the trial and the procedure in the action is unnecessary.  Plaintiff's decedent, her husband, was killed in the plant of the Dunn Woolen Company, while there engaged in work as an employee of that company, by an electric current or by a fall occasioned in some unknown way.  He was alive but unconscious, when found, and died immediately afterward.  There is no living eye-witness to the fatal accident, and the evidence of negligence adduced was largely, if not entirely, circumstantial.  The action is against the Potomac Light and Power Company by which electricity for lighting purposes was furnished to the plant in which he was working, not against his employer. Hence, the law of master and servant does not govern the rights

of the parties. The plaintiff proceeds upon the hypothesis of a defect in the wires or plant of the defendant company, negligently permitted, by reason of which an unusual and undue charge of electricity entered the plant of the Dunn Woolen Company, over the service wires, and caused the injury complained of. The theory of the defendant is that, on account of the situation in which the decedent was and defectiveness of the electrical appliances in the room in which he worked, for which it was not in any way responsible, they being no part of its plant or system, the electric current contemplated and furnished for the factory, 110 volts, was sufficient to kill the employee, if he came into contact with it by his own negligence or through the negligence of his employer, and did either kill him or knock him down in such manner that, in his fall, he received fatal injury, he having come into contact with it by reason of his own or his employer's negligence.

His surroundings, his hands, the materials he was handling and no doubt his clothing were all damp and the electrical appliances used, unsafe on account of these conditions. He operated what is known as a drying machine through which he passed wet wool and shoddy taken from the vats in the dye house of the factory. It was of steel construction, new and set in concrete, at a point about eighteen inches from a partition wall, in a room the floor of which was new concrete not yet thoroughly dry. On it, there were three pulleys, each carrying a three inch belt. It had an air door which stood open at an angle of about 45 degrees with the steel edges turned up. Near this door and over one of the pulleys, there was a thermometer and near it a drop electric light on a cord, used for lighting the dark space around the thermometer. The pulleys, bolts and steel door were unprotected by any guard or safety device. The wiring and sockets were unsuitable and bad for such a place, the wires not having been put in tubes, as experts say they should have been, and the sockets having been brass instead of porcelain. The workman's hands, feet and clothing and the floor on which he worked were all damp and the air necessarily moist. Between 9 :30 and 10 o'clock of the night of February 26, 1917, he was found lying in the narrow space between the machine and the partition, in a puddle of blood. One of the belts was off, the steel door open and the

light unextinguished. In his right temple there was a wound from which blood was flowing and which the examining surgeon said went deep into the tissue of the head, although it looked like a superficial injury.

Appreciating and admitting the application, force and effect of the rule, *res ipsa loquitur,* the defendant, after the plaintiff had proved, *prima facie,* death from an electric shock, previous good health of the decedent and sufficiency of 110 volts to kill, introduced evidence proving, in the absence of contradiction, that its transformer reducing the high voltage, 2,200, to low voltage, 110, was in a safe condition and bore no evidence of disturbance by an unusual shock, and that its wires in the streets in the neighborhood of the Dunn Woolen Company were so arranged and insulated by insulators on the poles and air spaces between the wires as to make them safe. Then it proved the defectiveness and unsuitableness of the wiring and fixtures in the room in which Lindamood was working, and, by expert testimony, that, under such conditions, the ordinary voltage was sufficient to kill one coming into contact with it. Proof was introduced also, to the effect that none of the wiring or fixtures in the room or building bore any evidence of their having been subjected to the heavy voltage carried by the high tension wires supplying electricity to the service wires through the transformer; and that the secondary or service wires and the wires and fixtures in the building could not carry the high voltage of the primary wires without injury or, in some instances, destruction.

In rebuttal, the plaintiff introduced testimony tending to prove the service wires would carry 1,100 or 2,200 volts for a short time, without any manifestation of its presence until a socket or wire would come in contact with something that would ground the current; that, on the night of the accident, wires were sparking at the corner of Stephen Street and Maple Avenue, at about 9:30 o'clock on account of a limb that had blown over the secondary wires leading into the residence of one Barnard; that, on the morning after the accident a woman was knocked down by electric current in a house near the Barnard residence, while using an electric iron; that a man helping to remove Lindamood received a severe shock in the back by rea-

son of his coming into contact with the socket at the machine; and that another workman, a few minutes later, got a severe shock from taking the socket in his hand.

The new evidence discovered after the trial, which induced the trial court to set aside the verdict for the defendant, as interpreted by the attorneys for the plaintiff, was that, on the night of Lindamood's injury and death, at about eight o'clock, in front of the County Jail, and not far from the Dunn Woolen Company's building, one of the wires smoked, burned, sputtered and then broke, at a point about six feet from one of the poles, and fell among the other wires; that the defendant company was immediately notified by telephone; that it sent a man to that place, who tied the long end of the broken wire around a pole; that, on the next morning, a man came and spliced and repaired the wire; and that, after the trial and nearly a year after the date of the accident, a splice was found in the defendant's primary or high voltage wire, strung above other wires, at a point a few feet south of the pole in front of the County Jail.

This interpretation of the affidavits of the witnesses is vigorously assailed in the briefs filed for the defendant. The two Millers, the jailer and his son, do not say the wire broke on the night of the accident, but, fairly read, both affidavits place the date of the occurrence near that night. They say they resided in the jail on that date and saw the broken wire. M. S. Miller says he is unable to say whether the break occurred on the night of Lindamood's death. His son says he was at a hospital visiting his wife, when a message was received, calling a physician to attend a man at the Dunn Woolen Mills, who he afterwards learned was Lindamood, but does not say both incidents occurred on the same night. Affiant Hough, a policeman, says he saw the broken wire in front of the jail on the morning after the accident. He testified on the trial, without mention of the broken wire at the jail, but that argues nothing against the plaintiff's interpretation of the affidavits considered as a whole, on the question of identity of the time of the two occurrences.

As to the relation of the broken wire to the service wires and the Dunn Woolen Mills, the joint affidavit of J. O. Henson and H. H. Emmert and that of Shade suffice. Henson and Emmert say the break at the jail was on the lines from the transformer

serving the Dunn Woolen Mills and that they are informed and believe the high voltage wires at that point are above the secondary or service wires coming from the same transformer. Shade says the spliced wire was a primary wire and on the top cross-arm. Hence, the secondary wires must have been below it.

If the plaintiff is not precluded from reliance upon this evidence for a new trial, by lack of diligence in the discovery thereof, it sustains the grant of a new trial by the court. It is not cumulative, for no evidence at all concerning the break of the wire at the jail was introduced by her. She adduced no evidence of any defect in the defendant's wires that could have caused the injury. The limb across them at another place was a wholly distinct matter having only slight probative value. If there was such a break at the jail as the witnesses describe in their affidavits, it was a circumstance of such character as would have carried the case to the jury and ought to have called for a verdict for the plaintiff, in the absence of proof of any other circumstance avoiding its legal effect. It would have imposed upon the defendant, under the operation of the rule, *res ipsa loquitur*, the burden of proving proper construction of its wires at that point and due inspection thereof, if nothing more, by way of precaution against their giving away and causing injury to somebody. *Edmonds* v. *Traction Co.,* 78 W. Va. 714; *Snyder* v. *Wheeling Electric Co.,* 43 W. Va. 661.

On the question of diligence on the part of the plaintiff, the defendant takes two positions, one of which is that the plaintiff was bound to discover this evidence before trial or lose the benefit of it. M. S. Miller, an officer of the court and an after-discovered witness, was in the court room during a part of the trial and could easily have been interviewed, and his son, the other party who saw the break, was accessible. Hough had been a witness in the case and testified to the disturbance caused by the limb across the wires near Barnard's residence. In his affidavit filed after the trial, he says he had forgotten the broken wire at the jail, when interviewed by the plaintiff's attorneys, as to what he knew of electrical disturbances, and did not think of it until his attention was called to it later by one Smith. Omission to interview the Millers is excusable, if the plaintiff had no reason to believe or suspect that they had the knowledge they

now disclose. If the location of the break and the presence of the Millers at the time had been known, there would have been reason to suspect their knowledge of the occurrence, and failure to interview them would have been fatal. *Jacobs* v. *Williamson,* 67 W. Va. 377; *Phenix Ins. Co.* v. *Virginia-Western Power Co.,* 81 W. Va. 298. But there is no authority holding failure to interview a witness not known to have any knowledge of· the subject matter of the litigation, to be fatal to the use of his affidavit disclosing after-discovered evidence. But the affidavit of the Millers leave a link supplied only by that of Hough who was known to have some knowledge of some of the defendant's wires on the morning after the accident, namely, the time of the break of the wire at the jail. Boyd's affidavit as to it gives only hearsay evidence. Culpability in the matter, if any, rests upon Hough only. Plaintiff and her attorneys swear they diligently sought evidence to sustain their client's case. The attorneys say they interviewed various members of the police force, of whom Hough was one, and Hough swears they interviewed him and would have obtained all of his knowledge, but for his failure of. recollection. Ordinarily, the forgetfulness of a witness is no ground for a new trial, because he is supposed to have been diligently interviewed and called upon to remember the facts and state them. *Duignan* v. *Wyatt,* 3 Blackf. (Ind.) 385; *McQueen* v. *Stewart,* 7 Ind. 535. But, if it appears that he has been diligently interviewed and that the matter to which his evidence relates is new and decisive in its import and other witnesses will testify to it in such manner as to make its existence highly probable, we are of the opinion that his affidavit may be used, and read in aid of the other testimony. The purpose of the requirement of diligence is not defeat or prevention of new trials, and it should be applied in a reasonable and fair way. *Bonynge* v. *Waterbury,* 12 Hun. (N. Y.) 534. Only reasonable diligence is required. *Smith* v. *McLain,* 11 W. Va. 668, citing many cases. Manifestly such diligence has been exercised, as regards these witnesses, if the plaintiff had no knowldge of the evidnce she now relies upon.

It is insisted, however, that the plaintiff was aware of the knowledge of the Millers and Hough, before the case went to trial. Unfortunately, she started into this litigation under em-

barrassment.  One set of attorneys investigated the case and found the evidence in question, under the impression that she intended to employ them, created by representations of one Smith, a justice of the peace, who professed to have interviewed her respecting her case and the employment of attorneys to represent her.  Afterward, she employed other attorneys to whom this information was not given and she swears she never employed the attorneys who obtained and held it and that it was never communicated to her.  Her affidavit is very full and definite on this subject, completely excluding any transaction between them and her, direct or indirect, and denying all knowledge of their possession of the evidence.  She denies that she ever had any conversation with any member of the firm relative to her suit. One of them says he called upon her to discuss the case, under the impression that his firm was to be retained, but was informed that she had employed no attorney and would not do so until her brother arrived, and that thereupon he left without discussing the matter further.  Another member of the firm represented to one of the attorneys for the defendant that the plaintiff knew of the witnesses whose affidavits had been taken; that she had employed his firm; that M. S. Miller told them of the sputtering wire the day after Lindamood's death; and that he and another member of his firm continued their investigation of the case for about a week, when they were informed that other attorneys had been employed.  The attorney filed his affidavit, admitting the representations imputed to him, and saying he had acted under the belief that he had been employed, but had ascertained that he had not been, and denying that he had ever had any conversation with the plaintiff.

The conduct of the parties clearly overcomes the inferences the attorneys for the defendant set up on the admissions made by Boyd.  His firm did not appear in the case.  This fact effectually negatives the existence of the relation of attorney and client at that time.  If it had previously existed, it is morally certain that the attorneys did not disclose to the plaintiff the evidence they had found.  If they had, it would undoubtedly have been used in the trial, for it was obviously much more substantial and probative in its import and nature than any that was introduced.  Both she and the attorney representing her

in the trial had strong reason for using it and none for its omission, if it was within their knowledge. Boyd's representaton about the plaintiff's knowledge of the witnesses was not very definite. He evidently did not make it upon his personal knowledge, for he says he never conversed with her. She denies that he ever did and his associates say they never discussed the case with her. Only one of them had seen her and he denies having done so. All say there was no contract of employment. Hence, the trial court was justified in finding lack of a prior relation of attorney and client, which might or might not have imputed to the plaintiff the knowledge possessed by her former attorneys. In point of quality as well as quantity, the preponderance of evidence accords with the court's finding. No reason is perceived why review of this finding as to a question of fact should be governed by a rule diffierent from the one ordinarily applied.

It is urged also that, if she had caused the wires to be inspected, she would have discovered the break or evidence of it, which would have suggested probable knowledge of the fact on the part of Miller and others residing in the neighborhood thereof. Before bringing an action for an injury, the injured party ordinarily and necessarily makes an effort to ascertain by what wrongful act it was inflicted, and is deemed to have known what was obvious or ascertainable by reasonable diligence. But there is no rule of law or practice requiring previous ascertainment of obscure matters or such as cannot be found otherwise than by a wide, thorough and minute investigation. The plaintiff made an effort to find evidence of noticeable manifestations of defects in the defendant's wires and appliances, and found some, but not the most important one, if she is correct in her representations. That broken wire, if any, was repaired the next morning, before many persons could see it and while her husband lay dead in her home and she was no doubt overwhelmed with grief and unable to give her attention to matters of the kind involved here. After it was repaired, the wire likely showed only such evidence of the occurrence as was discoverable by close inspection. Moreover, a splice in a wire, without more, might not have aroused inquiry if it had been discovered. The circumstances of this case

bear very slight resemblance, if any, to those of *Frymier* v. *Lorama Railroad Co.,* 76 W. Va. 96.

Upon these principles and conclusions, the order complained of will be affirmed.

*Affirmed.*